JAMES F. LONG

v.

LOTHAIRE B. COCKERN ET AL.

*Mortgages—Realty—Personalty—Foreclosure—Fixtures—Estoppel— Practice.*

1.  The mortgagee of realty is estopped as to third persons from claiming personal property as fixtures and included in the mortgage, by a previous action of replevin brought by him to recover the same.

2.  A real estate mortgage not executed, acknowledged and recorded in accordance with the statute in reference to chattel mortgages, can not be held to cover personal property named therein.

3.  Upon a suit brought to foreclose a mortgage upon a piece of land and a saw mill, this court declines to interfere with a decree awarding fore. closure as to the land, but refusing it as to the mill.

[Opinion filed November 23, 1888.]

APPEAL from the Circuit Court of Brown County; the Hon. WILLIAM MARSH, Judge, presiding.

Messrs. BERRY & EPLER, for appellant.

Messrs. JOHN J. TEEFEY, for J. W. Metcalf, appellee.

CONGER, J.  Suit was brought below to foreclose a mortgage on a piece of land and a saw mill.  The questions presented by this record grow out of the final decree rendered on the hearing upon bill, answers, replication and proofs taken. The decree awarded foreclosure as to the land, but refused it as to a steam engine and saw mill included in the mortgage, and which were held to be personalty and not within the lien of the mortgage.  From this decree complainant appeals.

The question here at issue is, whether foreclosure should not have been granted as to the saw mill and other property covered by the mortgage as well as to the land itself.

The record shows the following facts : In September, 1885, at Clayton, Illinois, James F. Long bargained to sell to L. B. Cockern a saw mill for $1,200, Cockern agreeing to give him as security a mortgage on a piece of land which he claimed as his own, and the mill.  The mill was then seven miles south of Clayton.  Cockern said he would go home and make out the papers, which his wife would have to sign.  The land was in fact owned by Mrs. Cockern.  It was also subject to a prior mortgage of November 24, 1884, under which, on December 18, 1886, it was sold for $328.95, to which pro-

ceedings J. F. Long was not made a party. The land was rough and hilly, chiefly valuable for its timber, and was worth about $500. It was a good place to operate a saw mill. .

L. B. Cockern proposed to his wife, Emily S. Cockern, that if she would join him in a mortgage on the land he would erect a saw mill thereon and attach it thereto and operate it, and out of lumber sawed he would pay off the mortgage and leave her the land and mill free of incumbrance. She accordingly signed the mortgage. The note was made by L. B. Cockern at Carthage, Illinois, October 21, 1885, in the sum of $1,200, payable to James F. Long or order, six months after date, with interest at eight per cent. after maturity. To secure the same, on said day L. B. Cockern and Emily S. Cockern executed to James F. Long a mortgage on "the south fifty-six acres of the east half of the southwest quarter of section number two (2), township three (3), south of range six (6), west of the fourth principal' meridian," in Adams county, Illinois. A few days after, L. B. Cockern took the papers down to the saw mill where Long.was. Long, seeing that the saw mill was not mentioned in the mortgage, insisted on its being inserted, and L. B. Cockern thereupon wrote in the mortgage, after the word meridian, the words "together with one portable steam engine and saw mill, boiler wagon and log wagon," doing this under his bargain with Long and in harmony with his agreement with his wife, though in her absence. The note and mortgage were delivered to Long, and Cockern took possession of the mill.

Under Cockern's directions, Long then put the mill on the land mortgaged. The mill was put up on sills. The boiler was sunk in the ground about level with the top. The saw mill was fastened to stakes driven into the ground to keep the track from slipping.· A shed was put over the mill on posts. Cockern, who had just bought the mill, told Long that it was placed there for permanent use, and that the shed was put there to stay. Cockern claimed the land as his own until the mill was placed on it, when he said it belonged to his wife. Emily S. Cockern, who owned the land, states in her answer that L. B. Cockern placed the saw mill on the land

under his agreement with her, and that it became part of the realty, and L. B. Cockern alleges in his answer that the saw mill was attached to and was a part of the real estate mortgaged. The decree finds as a fact that the steam engine and saw mill were placed upon said real estate by L. B. Cockern shortly after the execution of the note and mortgage for use on the land. Long sawed timber for Cockern there about two months, in 1885 and 1886.

The note matured in April, 1886. Long then demanded payment of L. B. Cockern, but was refused. Nothing was ever paid on the note. On June 17, 1886, Long, having failed to get a settlement, by his attorneys, Moore & Staker, brought replevin in the Adams county Circuit Court for the saw mill, engine, machinery and tools used therewith, and the boiler wagon and log wagon, and got possession of the same June 19, 1886. Long then took said property to Meredosia, Illinois, where he held it until May, 1887.

The replevin suit came up for trial at the March term, 1887. The pleas were *non cepit*, *non detinet*, property in defendant, no property in plaintiff, and not guilty. After being called and sworn the jury was discharged and the case tried by the court. On the trial, before any judgment was rendered, on May 7, 1887, plaintiff dismissed his suit, whereupon judgment was given against plaintiff for costs, a writ of *retorno habendo* awarded to defendant, and case continued as to assessing damages. The writ of *retorno*, issued May 16, 1887, to the sheriff of Morgan county, who, May 17, 1887, seized said property in Long's possession and turned it over to L. B. Cockern.

On May 9, 1887, two days after the replevin suit was dismissed, L. B. Cockern executed a warrant of attorney giving power to confess judgment on his note of August 26, 1886, for $1,200, to Edward R. Metcalf, of Carthage, Hancock county. On this judgment was entered May 10, 1887, for $1,267.50 and costs. On May 17, 1887, the day the property was taken from Long and given to Cockern under the *retorno*, execution issued on said judgment to the sheriff of Morgan county who, the next day, May 18th, levied on the property in Cockern's possession for E. R. Metcalf, by Metcalf's direction. Loomis,

the deputy sheriff, posted notices to sell in ten days, and went down May 28th to sell.

Meanwhile, E. R. Metcalf agreed to turn his judgment against L. B. Cockern over to his son, John W. Metcalf, defendant in this suit, to make what he could out of it and apply the proceeds on a debt his father owed him. The judgment was accordingly assigned on the record May 31, 1887.

On May 28, 1887, the day of sale under the execution, Long met Loomis, the deputy sheriff, and J. W. Metcalf, walking together at Meredosia. Long then notified Loomis that he had a $1,200 mortgage on the mill, and told him not to sell it, and that if he did, he would hold the sheriff responsible. Metcalf says he did not hear the claim made by Long and that he knew nothing about the mortgage until he bought the mill of Cockern, but he admitted on his cross-examination that he knew at that time, there had been a replevin suit between Long and L. B. Cockern, and that the property had been put into Cockern's hands by a writ issued in the replevin suit. Long says Cockern and Metcalf kept away from him. Loomis required an indemnifying bond before selling the mill, and as none was given, continued the sale ten days. Meanwhile, Long held the mill as custodian under the sheriff.

Before the day the sale was postponed to, Cockern went to J. W. Metcalf at work on his farm and said that time and expense would be saved by settling the matter. They went together to Meredosia. On the way there J. W. Metcalf agreed to give Cockern $500 for the mill and apply it on the judgment, and Cockern was to take the mill to Fort Madison, Iowa, and rent it of Metcalf for $60 a month. Loomis, the deputy sheriff, met them at Meredosia on the day to which the sale was continued. J. W. Metcalf and Cockern told Loomis the judgment was satisfied and for him not to sell, but did not tell him what the arrangement was. On June 14, 1887, Loomis, by Metcalf's direction, vacated the levy and returned the execution unsatisfied, and Metcalf took possession of the mill under his arrangement with L. B. Cockern.

When the mill was thus put in Metcalf's hands, L. B. Cockern and Loomis were present but Long was not. Cockern offered to stay and help Metcalf load the mill on the cars to take it away.

J. W. Metcalf claims to be a *bona fide* purchaser of the mill and other property from L. B. Cockern, relying on his possession under the *retorno habendo*, and says that he had no notice of Long's claim on the mill under the mortgage before he made his purchase of Cockern. This Metcalf claims in his answer, and in his testimony.

N. C. Bushnell, postmaster at Meredosia, testified that he had a talk with J. W. Metcalf before Cockern turned the mill over to Metcalf, in which he told Metcalf of Long's mortgage on the mill, and Metcalf said he knew all about the mortgage. Metcalf testified that he had a talk with Bushnell then but that he did not remember talking to Bushnell about the mill, though he would not swear he was not talking about Long's claim against the mill.

Long testified that he did not see Cockern there that day; that they kept away from him. Cockern went home that evening. Metcalf stayed and worked at the mill to load it on the cars. Long then began this suit. The bill, filed June 17, 1887, sets up the note and mortgage, the contemplated removal of the saw-mill property by L. B. Cockern and J. W. Metcalf from the State and jurisdiction of the court; that the security was scant and L. B. Cockern insolvent, and the land sold under a prior mortgage, and prays that defendants be restrained from removing the saw-mill property from where it was; that a receiver be appointed for the same, and for a foreclosure of said mortgage on the property described therein, and for a decree against L. B. Cockern for any deficiency.

An order for a temporary injunction was made June 17, 1887, and an injunction writ issued to the sheriff of Morgan county, which Loomis, deputy sheriff, served June 18, 1887, on J. W. Metcalf and the agent of the Wabash Railway Company.

When the injunction was served, the saw mill was at the depot at Meredosia, and Metcalf was putting the boiler on the cars. On June 24, 1887, the court appointed Richard Seaton

receiver, who, June 25, 1887, took possession of the saw-mill property at Meredosia, and removed it to Quincy, Illinois, where he has since had it stored.

Emily S. Cockern, in her answer, admits her execution of the mortgage before the clause, "together with one portable steam engine and saw mill, boiler wagon and log wagon," was inserted therein, and that such insertion was made by L. B. Cockern at Long's request, in her absence, and was an alteration that avoided the mortgage. She also alleges that her husband promised her if she would sign the mortgage on the premises he would put the saw mill thereon, cut enough timber to pay the debt and leave her the land and mill free from incumbrance, and for that reason she executed it; that L. B. Cockern, in pursuance of his said agreement with her, erected and placed upon the land said saw mill, which then became part of the realty. She alleges that Long took away the saw mill from the land and wasted the premises to the amount of the mortgage debt. She asks to have the property restored to its former condition, or for the waste to be set off against the debt. She alleges on information and belief that in some way, in a replevin suit between Long and L. B. Cockern, the saw mill was held to be L. B. Cockern's personal property and was by legal process put in his hands in Morgan county, and there seized on execution against him by one Metcalf, and thus put beyond her reach and control.

L. B. Cockern, in his answer, admits executing the note and mortgage, and alleges that the steam engine and saw mill were attached to and were a part of the real estate, which belonged to E. S. Cockern; that he put the mill there to cut the timber thereon into lumber, and that if left there, the saw mill would have paid the mortgage debt and left a surplus; that on June 19, 1886, Long severed and removed the saw mill to Morgan county under a replevin writ; that the loss and damage done amounted to $1,421.87, which he asked to be set off against the debt. He denies all fraud, but says that the saw-mill property, while in Morgan county, was seized on execution for his debt and held by his creditor, and that, if lost to Long, it was lost by his wrongful severance and by no fault of his

(Cockern's). He admits the sale of the land under a prior mort-gage and that he is insolvent. L. B. Cockern says nothing in his answer of his selling the property to J. W. Metcalf on vacation of the levy.

J. W. Metcalf answers, in substance alleging that he is informed that Long removed the steam engine and saw mill from the land to Morgan county, where he held it as personal property until May 17, 1887, when it was taken from him under a writ of *retorno habendo* awarded on dismissal of Long's replevin suit against L. B. Cockern and given to Cockern, in whose possession it was levied on May 18, 1887, under an execution issued from Hancock county, on a judgment of E. R. Metcalf against L. B. Cockern of May 10, 1887; that while the sheriff held said property, believing it to be L. B. Cockern's by reason of his possession and said writ of *retorno*, respondent released said levy and purchased the same in good faith, for value, from L. B. Cockern, and became the owner thereof; that he knew nothing of Long's claim to the mill by mortgage at or before the time of such purchase; he denies all fraud, but admits that after so buying said property he arranged with L. B. Cockern to remove the same to Fort Madison, Iowa, to be used there by Cockern at a monthly rental of $60.

All the answers are sworn to, but as the bill waives the oath, they have effect as pleadings only, and not evidence; but the admissions therein made may be taken as true against the parties making them.

On November 3, 1887, the suit was dismissed as to the Wabash Railway Company, and an order of change of venue to Brown county, made on a petition of L. B. Cockern there-for, alleging prejudice in the judge.

The decree of March 2, 1888, finds, in substance, that the allegations contained in the bill were true as therein stated, and that said mortgage is a valid and subsisting lien upon the real estate therein mentioned, and that the property described therein as "one portable steam engine, saw mill, boiler wagon and log wagon," was placed upon said real estate by L. B. Cockern shortly after the execution of said note and

mortgage, and before the maturity of said note, for use upon said land, but that the said portable steam engine, saw mill, boiler wagon and log wagon were personal property and not within the lien of said mortgage; that no damages were suffered by granting the injunction; that the equities of the case are with the complainant; that there is due from L. B. Cockern to complainant for principal and interest, $1,346, which is adjudged him. The decree then awards foreclosure against the land and a decree against L. B. Cockern for any deficiency on sale, approves the receiver's report and directs him in thirty days to turn the saw-mill property over to defendant Metcalf, and dissolves the injunction without damages.

There are two principal questions presented by this record.

First, whether the mill was a fixture, and should have been included in the decree of foreclosure against the real estate. And secondly, if not a fixture, could appellant hold it under his mortgage as personal property.

We have prefaced this opinion by the statement of facts as submitted by counsel for appellant, which presents them fully as favorably for the appellant as the record will sustain, and we are inclined to think, under all the circumstances, the mill never became a fixture upon the mortgaged land. If, however, it could be so regarded, we think the action of Long in replevying it and treating it as personal property would estop him as against third parties from treating it as a fixture.

It is insisted, however, that the mortgage was good as a chattel mortgage to hold the mill as personalty. That when Cockern sold the mill to J. W. Metcalf, the latter had notice of Long's claim upon the mill, and therefore the mortgage, although not acknowledged as a chattel mortgage, was good and valid as to him.

If the mortgage was not executed, acknowledged and recorded in accordance with the statute in reference to chattel mortgages, it was void as a chattel mortgage against all third persons, whether they had actual notice of the facts in reference to Long's claim or not. If Metcalf acted in good faith in purchasing the mill, it is of no consequence how complete

his knowledge was of the true state of facts upon which Long bases his claim. Sage v. Browning, 51 Ill. 217; Porter v. Dement, 35 Ill. 478.

If he took it in payment of a pre-existing debt for a fair consideration, with the *bona fide* intention of paying himself, it does not matter what Cockern's motive may have been, nor how complete his knowledge of Cockern's intentions. Bump on Fraudulent Conveyances, Chap. 8, p. 234; Gray v. St. John, 35 Ill. 222.

The decree of the Circuit Court will be affirmed.

*Decree affirmed.*